# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| TINA WILLIAMS, ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION |
| ) | FILE NO. _____ |
| v. ) | |
| ) | |
| CHS GEORGIA MEDICAL, P.C. ) | JURY TRIAL DEMANDED |
| d/b/a/ PREMISE HEALTH, ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES

Plaintiff Tina Williams brings this action against Defendant CHS Georgia Medical, P.C. d/b/a Premise Health ("Defendant" or "Premise Health"), showing the Court as follows:

## INTRODUCTION

1. Ms. Williams brings this action against her former employer, Defendant Premise Health, based on the illegal race, gender, and pregnancy discrimination and retaliation she experienced in the workplace.

2. Ms. Williams asserts claims of race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"); gender and pregnancy discrimination under

42 U.S.C. § 2000e(k) ("Title VII," "the Pregnancy Discrimination Act," or "PDA"); and retaliation in violation of Section 1981, Title VII, and the PDA.

3. Ms. Williams seeks injunctive and declaratory relief, back pay and lost benefits, front pay or reinstatement to a full-time position with commensurate benefits, compensatory damages, punitive damages, and attorney's fees and costs of litigation.

## JURISDICTION, VENUE, AND PARTIES

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

5. Venue is proper because Defendant conducts business in the Northern District of Georgia and the unlawful employment practices giving rise to Ms. Williams' claims occurred in this judicial district and division. *See* 28 U.S.C. § 1391(b).

6. Ms. Williams resides in the Northern District of Georgia and is a citizen of Georgia. Ms. Williams submits herself to this Court's jurisdiction.

7. This Court has personal jurisdiction over Defendant because Defendant is a Georgia professional corporation that employs health care practitioners who provide health care services at employer-sponsored health centers across Georgia.

8. Defendant may be served with process via its registered agent:

Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

9. At all times material to this Complaint through Ms. Williams' last day of work with Defendant, Ms. Williams was Defendant's employee within the meaning of Title VII and the PDA.

10. Defendant Premise Health is an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e, because it engages in commerce or in an industry affecting commerce and has had more than 15 employees working day in each of 20 calendar weeks in the current or preceding calendar year.

11. At all times material to this Complaint, Defendant Premise Health had more than 500 employees within the meaning of Title VII.

## ADMINISTRATIVE PROCEEDINGS

12. Ms. Williams filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 410-2020-07236, alleging race discrimination, sex discrimination, and retaliation against Defendant within 180 days of the occurrence of the acts of which she now complains.

13. The EEOC issued Ms. Williams a Notice of Right to Sue on May 28, 2022. Ms. Williams filed this lawsuit within 90 days of receipt of that Notice, thus Ms. Williams' Title VII and PDA claims are timely filed.

14. Ms. Williams has exhausted the administrative prerequisites to filing her Title VII and PDA claims.

## FACTUAL ALLEGATIONS

### *Ms. Williams' Position and Performance at Premise Health*

15. Ms. Williams is a multi-racial, person of color (African American and Caucasian).

16. Ms. Williams began her employment with Premise Health in or around November 2016 as a Health Care Manager.

17. Ms. Williams worked out of a health center at the CNN Center sponsored by Defendant's client, Time Warner/AT&T.

18. Around late July 2019, Ms. Williams went on approved maternity leave and she returned to work in November 2019 as a Nurse Practitioner.

19. Upon returning to work, Ms. Williams met with Premise Health Associate Vice President, Rebecca Ice, to discuss a schedule for expressing/pumping breast milk as Ms. Williams was still lactating.

20. Ms. Williams and Ms. Ice agreed that Ms. Williams could take time during the workday to express milk in Ms. Williams' office.

21. Typically, Ms. Williams would express milk once in the mid-morning, once during her lunch hour, and once in the mid-afternoon.

22. For around two months, Ms. Williams adhered to this agreed upon schedule without incident.

### *Ms. Reyes Becomes Ms. Williams' Supervisor and Subjects Her to Gender, Pregnancy, and Race Discrimination*

23. Ms. Williams' work environment changed in January 2020 when Jennifer Reyes became Ms. Williams' supervisor and moved into Ms. Williams' office. Ms. Reyes is white.

24. When Ms. Reyes moved into Ms. Williams' office, Ms. Williams told Ms. Reyes that she had concerns about expressing milk in their shared office while Ms. Reyes was in the room.

25. Pumping breast milk is an intimate matter: Ms. Williams had to disrobe, expose one or both of her breasts, apply the pumping equipment, and express milk for as long as 25 minutes with her breast(s) exposed.

26. Ms. Reyes was dismissive of Ms. Williams' concerns, and she refused to give Ms. Williams privacy while she expressed milk, even though there were several open rooms available in the office.

27. On top of Ms. Reyes' refusal to give Ms. Williams privacy to express milk, Ms. Reyes deliberately disrupted Ms. Williams' ability to pump milk and humiliated her for pumping.

28. Specifically, Ms. Reyes often chided Ms. Williams for spending too

much time during working hours expressing milk and threatened to remove and/or reduce Ms. Williams' time for breast pumping.

29. Ms. Reyes admitted during a meeting that she timed and logged Ms. Williams' breast pumping sessions, which made Ms. Williams feel uncomfortable.

30. Ms. Reyes did not track the hours of other clinicians, clinicians who were not lactating/expressing milk. Ms. Reyes also scheduled meetings during the health center's lunch hour, a time slot that Ms. Reyes knew Ms. Williams used to express milk.

31. Ms. Reyes refused to allow Ms. Williams to excuse herself from these meetings to express milk and told her that she could do so only after work hours.

32. Additionally, Ms. Reyes repeatedly mocked Ms. Williams by verbally mimicking the sound of Ms. Williams' breast pump. Ms. Reyes' comments made Ms. Williams feel humiliated.

33. Ms. Reyes also treated Ms. Williams and other non-white staff in the health center differently than the white staff.

34. For instance, Ms. Reyes scrutinized and micromanaged Ms. Williams', Shanta Evans' (Filipina/Black), and Crystal Flowers' (Black) work more heavily than the white staff and Ms. Reyes searched through Ms. Williams', Ms. Evans', Tanielle Robinson (Black), and Rai'Chel Murray's (Black) personal effects without

permission.

35. Additionally, Ms. Reyes gave favorable treatment to white staff members: she did not enforce the no-jeans policy against Linda Brooks (white), who consistently wore jeans to the office and Ms. Reyes allowed a white staff member to speak with her in a harsh tone using expletives on more than one occasion without any consequence or discipline.

36. Based on the abovementioned disparate treatment, Ms. Evans, Ms. Flowers, and Ms. Murray reported to Ms. Williams that they felt Ms. Reyes was discriminating against them on the basis of race.

### *Ms. Williams Reports Ms. Reyes' Discriminatory Conduct*

37. On or around March 11, 2020, Ms. Williams met with Ms. Reyes to discuss her concerns surrounding pumping milk, including having a private area to pump milk and preserving her lunch hour to pump milk.

38. Ms. Reyes became angry with Ms. Williams and threatened to further reduce Ms. Williams' scheduled time to express milk.

39. Ms. Reyes also told Ms. Williams that she should wait to pump milk after her shift.

40. A few days after her conversation with Ms. Reyes, Ms. Williams filed a formal grievance against Ms. Reyes with Defendant's Human Resources

complaining of gender, pregnancy, and race discrimination.

41. About two days later, Ms. Williams met with Lori Shaw, Premise Health Human Resources Manager, and Brett Chibvongodze, Premise Health Director of Client Operations, to discuss her grievance.

42. Ms. Shaw and Ms. Chibvongodze were dismissive of Ms. Williams' concerns and simply stated that they would talk with Ms. Reyes.

### *Ms. Williams is Terminated for Alleged Conduct that White Colleagues & Colleagues Who Were Not Expressing Milk Engaged In*

43. Beginning on or around March 16, 2020, in response to the COVID-19 pandemic, the health center where Ms. Williams and Ms. Reyes worked temporarily stopped scheduling in-person appointments and all staff were advised to maintain social distance from one another.

44. Defendant and Defendant's client also began implementing additional safety precautions for staff and patients, including requiring personal protective equipment, daily screenings for COVID-19 symptoms, and contact tracing.

45. However, as the COVID-19 pandemic developed, Defendant's requirements for staff evolved and frequently changed. Ms. Williams and other staff felt that, during this early stage of the pandemic, there was a lack of communication and guidance from Defendant regarding what was required of staff and that the advice staff did receive was confusing.

46. Even still, Ms. Williams complied with each and every safety precaution and requirement, including completing the daily screenings.

47. In the early months of the COVID-19 pandemic, the work environment at the health center was stressful and intense: Ms. Williams worked long hours and she frequently worked overtime.

48. Throughout this time, Ms. Williams was also still expressing milk at work.

49. During this time, Ms. Williams continued making verbal reports to Ms. Chibvongodze regarding the ongoing pregnancy and race discrimination she faced from Ms. Reyes, as well as the race discrimination non-white staff members experienced from Ms. Reyes.

50. Ms. Williams made such verbal reports to Ms. Chibvongodze every two to four weeks until around Spring 2020.

51. Ms. Chibvongodze said she would continue to speak to Ms. Reyes about Ms. Williams' concerns, but nothing changed.

52. On or around July 22, 2020, Ms. Reyes informed Ms. Williams that a patient Ms. Williams saw on July 8, 2020 had tested positive for COVID-19.

53. Ms. Reyes never asked Ms. Williams if she had any COVID-19 symptoms.

54. That same morning, around 10 a.m., Ms. Williams emailed Ms. Reyes and Judy Maynard, Premise Health Regional Clinical Operations Director, a summary of her contact with the patient in question.

55. Ms. Williams stated that she did not have a cough, fever, or shortness of breath (COVID-19 symptoms).

56. Out of an abundance of caution, Ms. Williams noted that in the previous week she had a headache for a day and a half, congestion, and slight fatigue as a result of working overtime and in dusty work areas.

57. These were also symptoms of Ms. Williams' menstrual cycle.

58. The following day, on July 23, 2022, Defendant terminated Ms. Williams' employment in a meeting.

59. Ms. Reyes, Ms. Chibvongodze, Ms. Maynard, Ms. Shaw, Autumn Schultz, and Human Resources members were present at this meeting, and they informed Ms. Williams that she was being terminated because of her "inappropriate use of a COVID-19 form," i.e., her failure to disclose COVID-19 symptoms in her screening log.

60. At least three white staff members failed to consistently complete the COVID-19 screening log around this time, yet they were not terminated or disciplined.

61. These white staff members are Ms. Brooks, Orlin Marquez, and Kaye Anne Starosciak.

62. These three white staff members also had not expressed milk and were not expressing milk during this time.

63. Additionally, in or around July 2020, other staff members Ms. Evans, Ms. Flowers, and Ms. Brooks, openly discussed their symptoms of fatigue, congestion/runny noses, and headache associated with the stressful work environment and long hours, but they all continued to come into work and were never terminated or disciplined.

64. These clinicians had not expressed milk and were not expressing milk during this time.

## COUNT I
## INTENTIONAL RACE DISCRIMINATION IN VIOLATION OF
## 42 U.S.C. § 1981

65. Ms. Williams incorporates by reference all preceding paragraphs of this Complaint.

66. At all times material to this Complaint, Ms. Williams and Defendant were parties to an oral contract of employment under which, *inter alia*, Ms. Williams worked for Defendant and Defendant compensated Ms. Williams for her work.

67. Ms. Williams performed her contractual obligations by, *inter alia*,

working for Defendant.

68. Under Section 1981, it is unlawful for Defendant to discriminate against Ms. Williams based on her race in the making or enforcement of contracts with her.

69. Section 1981's prohibition on race discrimination in the making or enforcing of contracts applies to Ms. Williams' employment contract with Defendant.

70. The above-pled facts constitute race discrimination in violation of Section 1981 because Defendant discriminated against Ms. Williams by terminating her employment because of her race.

71. Defendant's intentionally discriminatory actions caused Ms. Williams to suffer lost compensation and other benefits of employment, emotional distress, mental anguish, inconvenience, humiliation, and other indignities.

72. Ms. Williams is entitled to damages, including back pay and lost benefits, front pay and/or reinstatement, compensatory damages, attorney's fees and costs of litigation pursuant to 42 U.S.C. § 1988, and all other relief recoverable under Section 1981.

73. Defendant acted with malice toward Ms. Williams, authorizing an award of punitive damages.

74. Additionally, and in the alternative, Defendant acted with reckless

disregard for Ms. Williams' federally protected rights, authorizing an award of punitive damages against Defendant.

## COUNT II
## RACE DISCRIMINATION IN VIOLATION OF TITLE VII

75. Ms. Williams incorporates by reference all preceding paragraphs of this Complaint.

76. At all times material to this Complaint, Ms. Williams was Defendant's employee, and Defendant was Ms. Williams' employer, within the meaning of Title VII.

77. At all times material to this Complaint, Defendant had more than 500 employees.

78. Defendant violated Ms. Williams' rights under Title VII by terminating her because of her race.

79. Defendant undertook the above-pled conduct, including terminating Ms. Williams, because of Ms. Williams' race in violation of Title VII's anti-discrimination provisions.

80. Defendant's conduct caused Ms. Williams to suffer lost compensation and other benefits of employment, emotional distress, mental anguish, inconvenience, humiliation, and other indignities.

81. Defendant acted with malice toward Ms. Williams, authorizing an

award of punitive damages.

82. Additionally, and in the alternative, Defendant acted with reckless disregard for Ms. Williams' federally protected rights, authorizing an award of punitive damages against Defendant.

## COUNT III
## GENDER/PREGNANCY DISCRIMINATION IN VIOLATION OF TITLE VII AND THE PREGNANCY DISCRIMINATION ACT

83. Ms. Williams incorporates by reference all preceding paragraphs of this Complaint.

84. At all times material to this complaint, Defendant has been subject to the requirements of the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k).

85. At all times material to this Complaint, Ms. Williams was Defendant's employee, and Defendant was Ms. Williams' employer, within the meaning of Title VII.

86. At all times material to this Complaint, Defendant had more than 500 employees.

87. The PDA, which amended Title VII, provides that unlawful gender discrimination includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical condition." 42 U.S.C. § 2000e(k).

88. Defendant violated Ms. Williams' rights under Title VII and the PDA

by terminating her because she was expressing milk—a medical condition of pregnancy and childbirth—at work.

89. Defendant undertook the above-pled conduct, including terminating Ms. Williams, because Ms. Williams was expressing milk at work, in violation of Title VII as amended by the PDA.

90. Defendant's conduct caused Ms. Williams to suffer lost compensation and other benefits of employment, emotional distress, mental anguish, inconvenience, humiliation, and other indignities.

91. Defendant acted with malice toward Ms. Williams, authorizing an award of punitive damages.

92. Additionally, and in the alternative, Defendant acted with reckless disregard for Ms. Williams' federally protected rights, authorizing an award of punitive damages against Defendant.

## COUNT IV
## RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

93. Ms. Williams incorporates by reference all preceding paragraphs of this Complaint.

94. Ms. Williams engaged in protected activity under Section 1981 by filing a grievance with Human Resources and making internal reports to Ms. Shaw, Ms. Chibvongodze alleging race discrimination she and other staff members

experienced.

95. Defendant retaliated against Ms. Williams for engaging in protected activity under Section 1981 by terminating her employment shortly after her internal complaints and reports of race discrimination.

96. Defendant willfully and wantonly disregarded Ms. Williams' rights and retaliated against Ms. Williams in bad faith.

97. As a direct and proximate result of Defendant's unlawful retaliation, Ms. Williams has suffered loss of income and benefits, emotional distress, mental anguish, inconvenience, humiliation, and other indignities.

98. Pursuant to Section 1981, Ms. Williams is entitled to damages, including back pay and lost benefits, front pay and/or reinstatement, compensatory damages, attorney's fees and costs of litigation pursuant to 42 U.S.C. § 1988, and all other relief recoverable under Section 1981.

### COUNT V
### RETALIATION IN VIOLATION OF TITLE VII AND THE PREGNANCY DISCRIMINATION ACT

99. Ms. Williams incorporates by reference all preceding paragraphs of this Complaint.

100. Title VII prohibits employers from retaliating against employees who report or oppose race and gender (including pregnancy) discrimination.

101. Ms. Williams is an "employee" and Defendant Premise Health is an "employer" as defined by Title VII.

102. Ms. Williams engaged in protected activity under Title VII and the PDA by filing a grievance with Human Resources and making internal reports to Ms. Shaw and Ms. Chibvongodze alleging race, gender, and pregnancy discrimination.

103. Defendant retaliated against Ms. Williams for engaging in protected activity under Title VII by terminating her employment shortly after her internal complaints.

104. Defendant willfully and wantonly disregarded Ms. Williams' rights and retaliated against Ms. Williams in bad faith.

105. As a direct and proximate result of Defendant's unlawful retaliation, Ms. Williams has suffered loss of income and benefits, emotional distress, mental anguish, inconvenience, humiliation, and other indignities.

106. Pursuant to Title VII, Ms. Williams is entitled to damages, including back pay and lost benefits, front pay and/or reinstatement, compensatory damages, attorney's fees and costs of litigation pursuant to 42 U.S.C. § 1988, and all other relief recoverable under Title VII.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Tina Williams respectfully requests the following relief:

a. A declaratory judgment that Defendant violated Ms. Williams' rights under Section 1981, Title VII, and the Pregnancy Discrimination Act.

b. A permanent injunction prohibiting Defendant from engaging in further violations of the federal statutes listed above;

c. Full back pay from the date of Ms. Williams' termination, including all raises to which she would have been entitled but for her unlawful termination, and all fringe benefits of employment, with prejudgment interest thereon;

d. Compensatory damages, in an amount to be determined by the enlightened conscience of the jury, for all of Ms. William's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, and special damages;

e. Punitive damages against Defendant in an amount to be determined by the enlightened conscience of the jury to be sufficient to punish Defendant for its conduct toward Ms. Williams and to deter Defendant from similar conduct in the future;

f. Reasonable attorney's fees and costs; and

g.  Other and further monetary and equitable relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 25th day of August, 2022.

*/s/ Cheryl B. Legare*
Cheryl B. Legare
Georgia Bar No. 038553
Marcela X. Johnson
Georgia Bar No. 328871

**LEGARE, ATTWOOD & WOLFE, LLC**
125 Clairemont Ave, Suite 380
Decatur, Georgia 30030
Tel: (470) 823-4000
Fax: (470) 201-1212
cblegare@law-llc.com
mxjohnson@law-llc.com

*Counsel for Plaintiff*